**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STACEY PAPALIA, on behalf of herself and all
others similarly situated,

                        Plaintiff,

        v.                                                          Case No.:

                                                                    **COMPLAINT**
GLAXOSMITHKLINE CONSUMER
HEALTHCARE HOLDINGS (US) LLC,

                        Defendant.

        Plaintiff Stacey Papalia, on behalf of herself and all others similarly situated ("Plaintiff"),

by and through her undersigned counsel, Denlea & Carton LLP, states for her Complaint against

GlaxoSmithKline Consumer Healthcare Holdings (US) LLC ("GSK" or "Defendant"), as

follows:

### PRELIMINARY STATEMENT

        1.      This action seeks to redress the false, misleading and deceptive advertising and

packaging claim made by one of the world's largest manufacturers of cough medicines; namely,

that Robitussin's line of cough suppressants containing dextromethorphan ("DXM") are "non-

drowsy" when, in fact, DXM is known to cause drowsiness.

        2.      The worldwide market for cough and cold remedies is over $40 billion and almost

$14 billion for the Unites States alone. [1]  Standing alone, the market for cough suppressants is

over $7 billion.[2]  The biggest name in the market for cough suppressants is the Robitussin line of

---

[1]     https://www.statista.com/outlook/cmo/otc-pharmaceuticals/cold-cough-remedies/worldwide.

[2]     https://www.alliedmarketresearch.com/cough-remedies-
market#:~:text=The%20global%20Cough%20Remedies%20market,3.4%25%20from%202021%20to%202030.

cold and cough products manufactured and sold by defendant GSK which is a subsidiary of GlaxoSmithKline plc, a mammoth healthcare conglomerate with over $40 billion in global revenue.[3]  Robitussin sales alone contribute a staggering $1.4 billion to GSK's revenues.[4]

3.        It has been estimated that DXM is the active pharmaceutical in 85-90% of all cough suppressants,[5] which means GSK nets over a billion dollars from sales of its Robitussin cough suppressants containing DXM.  That further means that GSK can boost its revenues by $10 million for every 1% increase in Robitussin sales.  That immense incentive to increase sales of Robitussin was the likely catalyst for GSK to claim that all their Robitussin products containing DXM (hereinafter, "Robitussin DXM Products") marketed and sold in the United States are "non-drowsy," except for one "nighttime" formulation containing a sedating antihistamine.  Labeling Robitussin DXM Products as "non-drowsy," however, is demonstrably false and misleading because it is widely acknowledged by medical experts studying coughs that DXM can cause drowsiness.

4.        Disturbingly for consumers in the United States, GSK is well-aware that DXM can cause drowsiness because it is *prohibited* from making the same "non-drowsy" claim in the United Kingdom where GSK's parent company is headquartered.  Not only must GSK avoid making the "non-drowsy" claim for Robitussin products containing DXM in the UK, GSK must also disclose DXM's drowsiness side effect in the information it provides to UK consumers of its products.  For example, GSK warns its consumers in the UK that "[t]his medicine can impair cognitive function and can affect a patient's ability to drive safely" and "[t]he medicine can

---

[3]      https://www.gsk.com/media/7462/annual-report-2021.pdf

[4]      *Id.* at 197.

[5]      Spangler DC, Loyd CM, Skor EE.  Dextromethorphan: a case study on addressing abuse of a safe and effective drug.  *Substance Abuse Treatment, Prevention, and Policy (2016)*.  Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4918034/pdf/13011_2016_Article_67.pdf.

affect your ability to drive as it may make you sleepy or dizzy." That disclosure is not only absent from Robitussin's product packaging and marketing in the US, but the missing "dizziness" warning is actually exacerbated by the false representation that DXM is "non-drowsy."

5.     Plaintiff and thousands (if not millions) of cough sufferers have been misled by GSK's false "non-drowsy" claims. But for GSK's affirmative misrepresentations and failure to disclose the drowsiness side effect, Plaintiff and others would have avoided Robitussin DXM Products completely, particularly if their doctor advised them that DXM is not very effective in any event and has been demonstrated to be only "marginally superior to placebo" in controlling coughs. At the very least, Plaintiff and others were sold a product that falsely promised the valuable attribute of being "non-drowsy" when, in fact, they were sold inferior and less valuable products that had the unwanted attribute — at least during the daytime — of drowsiness.

6.     By this action, Plaintiff seeks to redress GSK's unfair and deceptive marketing campaign built upon the misleading promise that the Robitussin DXM Products are "non-drowsy" and to obtain the financial recompense to which Plaintiff and her fellow class members are entitled.[6]

### THE PARTIES

7.     Plaintiff Stacey Papalia is an individual who resides in Ossining, New York.

8.     Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC ("GSK") is a Delaware limited liability corporation with its principal address at 184 Liberty Corner Road, Warren, NJ 07059

---

6    Similarly, Plaintiff seeks to put the numerous other manufacturers and sellers of purportedly "non-drowsy" DXM cough suppressants on notice that their unlawful conduct will not be ignored so that they stop misleading consumers.

9.     GSK manufactures, markets and sells Robitussin DXM Products through online and brick-and-mortar retail stores such as Walmart, Amazon, Target, CVS, Costco, Walgreens, and Rite Aid.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and (2) the named Plaintiff and Defendant are citizens of different states.  28 U.S.C. § 1332(d)(2)(A).

11.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds the requisite threshold.

12.     This Court may exercise jurisdiction over Defendant because Defendant has sufficient minimum contacts in New York and purposely avails itself of the markets within New York through the promotion, sale, marketing, and distribution of its products, thus rendering jurisdiction by this Court proper and necessary.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district and because Defendant has marketed and sold the products at issue in this action within this judicial district and has done business within this judicial district.

## CHOICE OF LAW

14.     New York law governs the state law claims asserted herein by Plaintiff and the New York class she seeks to represent.

15.     New York has a substantial interest in protecting the rights and interests of New York residents against wrongdoing by companies that market and distribute their products within the State of New York.

## FACTUAL BACKGROUND

## I.     GSK's ROBITUSSIN DXM PRODUCTS FALSELY CLAIM THEY ARE "NON-DROWSY"

16.     GSK itself and through its affiliates manufactures, packages, markets, distributes, and sells the following Robitussin DXM Products that falsely claim that they are "non-drowsy":

- Robitussin Maximum Strength Elderberry Cough + Chest Congestion DM (containing DXM and Guaifenesin[7])

- Robitussin Maximum Strength Honey Cough + Chest Congestion DM (containing DXM and Guaifenesin)

- Robitussin Maximum Strength Cough and Chest Congestion DM (containing DXM and Guaifenesin)

- Robitussin Maximum Strength DM Day/Night Value pack (two containers, one for day time containing DXM and Guaifenesin and one for nighttime containing DXM and Doxylamine Succinate

- Robitussin Maximum Strength Cough & Chest Congestion DM Capsules (containing DXM and Guaifenesin)

- Robitussin Cough + Chest Congestion DM (containing DXM and Guaifenesin)

- Robitussin Sugar-Free Cough + Chest Congestion DM (containing DXM and Guaifenesin)

- Robitussin Children's Cough & Chest Congestion DM

- Robitussin Children's Honey Cough & Chest Congestion DM

- Robitussin Children's Elderberry Cough + Chest Congestion DM

- Robitussin Children's Cough & Cold CF.

---

[7]     Guaifenesin is an expectorant that is often combined with DXM.  Guaifenesin does not cause drowsiness.

17.     The following is an example of the packaging reflecting the false "non-drowsy" claim.  Each of the foregoing Robitussin DXM Products have similar packaging falsely claiming to be "non-drowsy"[8]:



18.     Each of the foregoing Robitussin DXM Products also have the following "drug facts" labeling which does not disclose possible drowsiness:

---

[8]     https://www.robitussin.com/adult-robitussin/.

## Drug Facts

### Active ingredients (in each 20 ml)                    Purposes
Dextromethorphan HBr, USP 20 mg ......................................... Cough suppressant
Guaifenesin, USP 400 mg ........................................................... Expectorant

### Uses
- temporarily relieves cough due to minor throat and bronchial irritation as may occur with a cold
- helps loosen phlegm (mucus) and thin bronchial secretions to drain bronchial tubes

### Warnings
**Do not use** if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug.  If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have**
- cough that occurs with too much phlegm (mucus)
- cough that lasts or is chronic such as occurs with smoking, asthma, chronic bronchitis, or emphysema

**Stop use and ask a doctor if** cough lasts more than 7 days, comes back, or is accompanied by fever, rash, or persistent headache. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.**  In case of overdose, get medical help or contact a Poison Control Center right away.

## Directions
- do not take more than 6 doses in any 24-hour period
- measure only with dosing cup provided
- keep dosing cup with product
- ml = milliliter
- this adult product is not intended for use in children under 12 years of age

| age | dose |
| --- | --- |
| adults and children 12 years and over | 20 ml every 4 hours |
| children under 12 years | do not use |

## Other information
- **each 20 ml contains:** sodium 12 mg
- store at 20-25°C (68-77°F).  Do not refrigerate.

## Inactive ingredients
anhydrous citric acid, carboxymethylcellulose sodium, FD&C blue no. 1, FD&C red no. 40, glycerin, liquid glucose, menthol, natural and artificial flavors, polyethylene glycol, propylene glycol, purified water, sodium benzoate, sodium citrate, sucralose, triacetin, xanthan gum

## Questions or comments?
call weekdays from 9 AM to 5 PM EST at **1-800-762-4675**

## II.    MEDICAL EXPERTS, THE FEDERAL AVIATION AUTHORITY, AND UK DRUG REGULATORS CONFIRM THAT DXM CAN CAUSE DROWSINESS

19.    Medical experts have long known that "daytime drowsiness is one of the major drawbacks of the centrally acting antitussives [DXM and dihydrocodeine]."[9]  As one study examining a potential alternative to DXM and other antitussives explained:

> Chronic cough has a prevalence of more than 12% in the general population.  In patients, the cause of cough remains unexplained even after some low detailed assessments.  There are very few safe and effective treatments for cough and there is an urgent need for new treatments.  The poor tolerability of most antitussives on the market is closely related to central nervous system side effects.  However, levodropropizine, a peripherally acting antitussive drug, has a good tolerability and safety profile.  Levodropropizine has been demonstrated to show equivalent efficacy and less sedative effects compared to other antitussive agents such as the centrally acting cough suppressants dextromethorphan or dihydrocodeine.[10]

20.    Another study found that DXM caused drowsiness in over 10% of the study's patients,[11] which means that a significant number of consumers of Robitussin DXM Products are unaware that they are taking a medication that may cause them to become drowsy while, for example, driving or handling other dangerous machinery.  No consumer was and is able to determine on their own whether they will experience drowsiness.

21.    MedlinePlus, the world's largest medical library published by the US government's National Institutes of Health, warns that DXM may cause drowsiness. [12]

---

[9]    Surinder Birring, et al., *Antitussive therapy: A role for levodropropizine*, Pulmonary Pharmacology & Therapeutics 56 (2019) 79-85 (a group of eight medical experts specializing in cough research examining a drug that had the potential to show equal efficacy to DXM with less sedative effects).

[10]    *Id.*

[11]    Ernesto Catena, Luisa Daffonchio, *Efficacy and tolerability of levodropropizine in adult patients with non-productive cough. Comparison with dextromethorphan*, Pulm. Pharmacol. Therapeut. 10 (2) (1997) 89–96. Available at https://www.sciencedirect.com/science/article/abs/pii/S1094553997900833?via%3Dihub#!

[12]    https://medlineplus.gov/druginfo/meds/a682492.html.

22.    GSK is well aware that drowsiness is a material side effect of DXM.  In the United Kingdom, GSK cannot and does not claim that its Robitussin products containing DXM are "non-drowsy":



23.    The following Robitussin products without DXM sold in the UK — "Chesty Cough" and "Mucus Cough" — do make the "non-drowsy" claims, meaning that GSK used the "non-drowsy" claim where it was permitted but not with the formulation containing DXM:





24.    In the UK (but not the US), GSK's marketing of its Robitussin with DXM product also lists drowsiness as a side effect and warns that "[t]his medicine can impair cognitive function and can affect a patient's ability to drive safely."[13]  Moreover, the "patient leaflet" for Robitussin with DXM required by the UK Medicines and Healthcare products Regulatory Agency ("MHRA")[14] lists drowsiness as a side effect and, in addition, states:

---

[13]    https://www.gskhealthpartner.com/en-gb/respiratory-health/brands/robitussin/products/cough-range/

[14]    https://products.mhra.gov.uk/search/?search=robitussin&page=1

**Driving and using machines**

The medicine can affect your ability to drive as it may make you sleepy or dizzy.

- Do not drive while taking this medicine until you know how it affects you.

- It may be an offence to drive when taking this medicine.

- However, you would not be committing an offence if:

• The medicine has been taken to treat a medical problem and

• You have taken it according to the information provided with the medicine and

• It was not affecting your ability to drive safely.

25.    If consumers should be strongly cautioned about driving while taking Robitussin with DXM, it is not surprising that the US Federal Aviation Authority advises pilots that they cannot fly while taking products with DXM.[15]  But in the US, both consumers who drive and pilots who fly are affirmatively misled by GSK's false assurance that the Robitussin DXM Products containing DXM are "non-drowsy."

26.    It is significant that the UK formulation, which requires warnings that Robitussin with DXM can cause drowsiness, contains 15 mg of the active ingredient DXM per dose. Medically, the UK regulators have determined that just 15 mg of DXM is sufficient to cause drowsiness.  This fact is known to GSK and it adheres to the U.K. requirements following the warnings it must issue.

27.    Yet for American consumers, GSK added 33% *more* DXM to the Robitussin formulations (20 mg vs. 15 mg), and, in an act of disturbing duplicity, GSK has the temerity to claim that the stronger DXM formulation sold in the United States is "non-drowsy."  GSK knows its "non-drowsy" claim is blatantly false.

---

[15]    https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf (implementing the FAA's prohibition in 14 C.F.R. § 61.53(a)(2) and (b) on flying while having a medical condition or taking medication that would impair the pilot).

28.     Not only does GSK know that DXM can cause drowsiness, it disregards the "half-life" of DXM in the human body.  Specifically, DXM has been shown to have a half-life (in its most conservative assessment by the National Institutes of Health) of 2.4 hours.  This means that in 2.4 hours, half of the DXM is cleared from the system.  Yet 9% of the population are what can be referred to as "poor metabolizers," meaning that they cannot purge the DXM from their system effectively.  For these individuals, "the median half-life is 19.1 hours, with an oral bioavailability of 80%."[16]  Following package directives of dosing up to six (6) times per day, this means that almost 10% of the consuming public have 120 mg of DXM poorly clearing from their system.

**III.     GSK'S "NON-DROWSY" CLAIM IS DESIGNED TO DECEIVE CONSUMERS.**

29.     Reasonable consumers obviously understand the "non-drowsy" claim to convey that the Robitussin products which contain DXM will not make them drowsy or sleepy.

30.     GSK's "non-drowsy" claim is false and misleading with respect to each of the Robitussin DXM products because the "non-drowsy" claim is contradicted by authoritative medical literature.  More importantly, GSK's "non-drowsy" claim is demonstrably false and misleading in light of GSK's inability to make the false "non-drowsy" claim for the same product sold in the UK which requires a warning that Robitussin with DXM (a) can cause drowsiness, (b) the product may make consumers "sleepy," and (c) the consumer should not drive while taking Robitussin with DXM until their reaction to the medication can be determined.

31.     GSK's representation on its US versions of Robitussin DXM Products that they are "non-drowsy" is not only false and misleading, it is far more dangerous than simply failing to

---

[16]     SaeRam Oh, et al., *Dextramethorphan*, NCBI Bookshelf.  Available at
https://www.ncbi.nlm.nih.gov/books/NBK538216/.

warn that the products may cause drowsiness.  Consumers may experience drowsiness while taking Robitussin DXM Products in the US and will logically conclude that those products did ***not*** cause their drowsiness because of the falsely reassuring "non-drowsy" claim.  Having eliminated Robitussin DXM Products as the cause of their drowsiness — again, because of the prominent and affirmative misrepresentation of being "non-drowsy" — consumers experiencing drowsiness from Robitussin DXM Products will nonetheless continue to take dose after dose as long as their cough continues, with potentially dangerous consequences.  Put another way, even if those consumers who experience drowsiness taking Robitussin DXM Products seek to discover the cause of their drowsiness, the last source they will identify is the Robitussin DXM Products because GSK, a prominent healthcare company, affirmatively misleads them that their cough medicine is ***not*** the cause of their drowsiness.

32.     It is self-evident that GSK uses the false and misleading "non-drowsy" claim to make its Robitussin DXM Products more valuable in consumers' eyes.  The vast proportion of consumers do not want to experience drowsiness or risk drowsiness during the day.  Plainly, GSK created the false and misleading "non-drowsy" claim to imbue Robitussin DXM Products with a unique and positive quality that is more valuable in consumers' eyes than the same product without the "non-drowsy" assurance.

## IV.    FEDERAL LAW DOES NOT PREEMPT PLAINTIFF'S CLAIMS UNDER NEW YORK CONSUMER PROTECTION LAWS

33.     Neither the FDCA nor the regulations promulgated thereunder address whether a "non-drowsy" claim is proper in connection with cough suppressants with DXM.

34.     Most "antitussive drug products," *i.e.*, cough suppressants, are over-the-counter ("OTC") drugs that are manufactured and sold pursuant to the "OTC Drug Monograph Review

Process."[17]  The FDA uses this process to create rulemaking for each therapeutic class of drugs

rather than for each individual drug.  According to the FDA:

> An OTC monograph is a "rule book" for each therapeutic category establishing
> conditions, such as active ingredients, uses (indications), doses, labeling, and
> testing, under which an OTC drug is generally recognized as safe and effective
> (GRASE)[18] and can be marketed without a New Drug Application and FDA pre-
> market approval. Nonprescription drug products marketed under the OTC Drug
> Review are referred to as OTC monograph drugs.

35.     21 C.F.R § 341.74 is the monograph for "antitussive drug products" (the

"Antitussive Monograph") and contains a phalanx of labeling, dosing, marketing and other

requirements for antitussives with common ingredients, including DXM which, as previously

noted, is contained in 85-90% of antitussives.  FDA monographs address both what a drug

marketer cannot say about a drug and what a marketer can affirmatively say about a drug.  For

example, the Antitussive Monograph states that an antitussive may claim that it "[t]emporarily

(select one of the following: "alleviates," "calms," "controls," "decreases," "quiets," "reduces,"

"relieves," or "suppresses") "cough due to" (select one….)"

36.     With respect to DXM products, the Antitussive Monograph does not address in

any way the use of a "non-drowsy" claim or the need for a "drowsiness" side effect disclosure or

warning.  The Antitussive Monograph does, however, require a warning that the ingredient

diphenhydramine (an antihistamine which is the active ingredient in Benadryl) "may cause

marked drowsiness," but no such warning is required for DXM.  During the development of the

Antitussive Monograph, the FDA published a "notice of rulemaking" in which it noted that it

declined to require a drowsiness warning for DXM because "[t]he agency is not aware of data

demonstrating that the antitussive ingredients codeine and dextromethorphan could be classified

---

[17]   21 C.F.R. § 330.10; https://www.fda.gov/drugs/over-counter-otc-drug-monograph-process

[18] An acronym for "generally recognized as safe and effective."

as Category I nighttime sleep-aids or that they require a drowsiness warning." 48 Fed. Reg.

48,576, 48,589 (Oct. 19, 1983) (emphasis added).  (In the context of the notice, the FDA meant

codeine and DXM separately, not as a combined drug.)  Since that notice of rulemaking in 1983,

clinical studies and medical experts studying coughs have noted the drowsiness side effect for

DXM.  Unlike the UK drug regulator, however, the FDA has not yet required a drowsiness

warning.  In short, the FDA has neither required a "drowsiness" warning nor has it ever approved

a "non-drowsy" claim.  The Antitussive Monograph has not changed for over 20 years.

37.     Neither the Antitussive Monograph nor any other provision in federal law

addresses the propriety of GSK's claim that its Robitussin DXM Products are "non-drowsy."

The FDCA does, however, prohibit product labels that are "false and misleading in any

particular," as does New York's consumer protection laws under which Plaintiff brings this

action.  As a consequence, Plaintiff's claims in this action that GSK's false and misleading "non-

drowsy" label and marketing for its Robitussin DXM Products violates New York's consumer

protection laws are not preempted by the FDCA or any regulation promulgated thereunder.

**V.     PLAINTIFF PURCHASED AND USED A ROBITUSSIN DXM PRODUCT**

38.     Plaintiff purchased Robitussin DM containing DMX in approximately October

2021 at her local Walgreens retailer.  She took the Robitussin DM over approximately four days.

She has also previously purchased other Robitussin products.

39.     Prior to purchasing the Robitussin with DXM product, Plaintiff was exposed to

GSK's marketing and labeling using the "non-drowsy" claim.

40.     Plaintiff purchased the Robitussin with DXM product believing that it could not

cause her to be drowsy.  Plaintiff drove her car while she was taking the Robitussin DM.

41.     Had Plaintiff known that the Robitussin with DXM could cause her to become

drowsy during her daytime activities, she would not have purchased it or, at the very least, would

not have paid the price premium charged for a cough suppressant that had the danger of making

her drowsy.  Now armed with the knowledge that the "non-drowsy" claim is false, she will no

longer use Robitussin making the product worthless to her.

## CLASS DEFINITION AND ALLEGATIONS

42.     Plaintiff brings this action on behalf of herself and all other similarly situated

consumers in the State of New York pursuant to Rule 23 of the Federal Rules of Civil Procedure,

and seeks certification of the following class (the "Class"):

> All consumers who, within the applicable statute of limitations
> period, purchased in the State of New York (whether online or in-
> person) Robitussin cough suppressants containing DXM which are
> manufactured, marketed, distributed and/or sold by Defendant
> which Defendant represented to be, or labeled as, "non-drowsy" (the
> "Class Products").  Excluded from the class are Defendant, its
> parents, subsidiaries, affiliates, officers and directors, judicial
> officers and their immediate family members and associated court
> staff assigned to this case, and those who purchased Class Products
> for resale.

43.     Plaintiff expressly disclaims any intent to seek any recovery in this action for

personal injuries that she or any Class member may have suffered.

44.     **Numerosity**.  This action is appropriately suited for a class action.  The members

of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiff

is informed, believes, and thereon alleges, that the proposed Class contains thousands of

purchasers of the Class Products who have been damaged by GSK's conduct as alleged herein.

The precise number of Class members is unknown to Plaintiff.

45.     **Existence and Predominance of Common Questions of Law and Fact**.  This

action involves questions of law and fact common to the Class.  The common legal and factual

questions include, but are not limited to, the following:

- Whether Defendant's conduct, as alleged herein, constitutes violations of New
  York General Business Law Section 349.

- Whether Defendant's conduct, as alleged herein, constitutes violations of New York General Business Law Section 350.

- Whether Defendant labeled, advertised, marketed, and/or sold each Class Product as "non-drowsy."

- Whether Defendant's labeling, advertising, marketing, and/or selling of each Class Product as "non-drowsy" was and/or is false, fraudulent, deceptive, and/or misleading.

46.    **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were subject to GSK's blatant misrepresentation that the Class Products would not cause drowsiness.  Moreover, Plaintiff's claims are typical of the Class members' claims.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

47.    **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff purchased a Class Product, and she was harmed by GSK's deceptive misrepresentations.  Plaintiff has therefore suffered an injury in fact as a result of GSK's conduct, as did all Class members who purchased Class Products.

48.    **Superiority**.  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against GSK.  It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her.  Further, even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also

increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

49.     Plaintiff seeks monetary damages, including statutory damages on behalf of the entire Class, and other equitable relief on grounds generally applicable to the entire Class, to enjoin and prevent GSK from engaging in the acts described.  Unless a Class is certified, GSK will be allowed to profit from its deceptive practices, while Plaintiff and the members of the Class will have suffered damages.  Unless a Class-wide injunction is issued, GSK will continue to commit the violations alleged, and the members of the Class and the general public will continue to be deceived.

50.     GSK has acted and refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole.

## COUNT I
### (Violation of New York General Business Law Section 349)

51.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 50 as if fully set forth herein.

52.     New York General Business Law § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

53.     By labeling, advertising, marketing, distributing, and/or selling Class Products to Plaintiff and the other Class members as "non-drowsy," GSK engaged in, and continues to engage in, deceptive acts and practices because the Class Products can, in fact, cause drowsiness.

54.     In taking these actions, GSK failed to disclose material information about its products, which omissions were misleading in a material respect to consumers and resulted in the purchase of Class Products.

55.     GSK has deceptively labeled, advertised, marketed, promoted, distributed, and sold the Class Products to consumers.

56.     GSK's conduct was consumer oriented.

57.     GSK engaged in the deceptive acts and/or practices while conducting business, trade, and/or commerce and/or furnishing a service in New York.

58.     GSK's false "non-drowsy" claims were and are misleading in a material respect as to whether the Class Products are "non-drowsy."

59.     Based on, among other things, GSK's knowledge of its own drowsiness warnings for the Robitussin products containing DXM that GSK sold in the United Kingdom, GSK knew that by making the misrepresentations addressed herein, Plaintiff and other consumers would be misled into purchasing a Class Product and/or paying a premium price for a Class Product.

60.     Plaintiff and the Class members have been aggrieved by and have suffered losses as a result of GSK's violations of Section 349 of the New York General Business Law.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured by purchasing and/or overpaying for the Class Products that are not what GSK represents them to be.

61.     By reason of the foregoing, GSK's conduct, as alleged herein, constitutes deceptive acts and practices in violation of Section 349 of the New York General Business Law, and GSK is liable to Plaintiff and the Class for the actual damages that they have suffered as a

result of GSK's actions, the amount of such damages to be determined at trial, plus statutory damages, treble damages, and attorneys' fees and costs.

62.     GSK's conduct, as alleged herein, in violation of Section 349 of the New York General Business Law was engaged in by GSK willfully and/or knowingly.  Accordingly, Plaintiff and members of the Class are entitled to an award of damages above and beyond their actual damages in accordance with Section 349(h) of the New York General Business Law.

63.     Plaintiff further demands injunctive relief enjoining GSK from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by Section 349 of the New York General Business Law.

## COUNT II
### (Violation of New York General Business Law Section 350)

64.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 63 as if fully set forth herein.

65.     GSK's labeling, marketing, and advertising of the Class Products is "misleading in a material respect," as it fails to disclose to consumers material information in GSK's sole possession and, thus, is "false advertising."

66.     No rational individual would purchase the Class Products at the premium prices at which they are sold if that individual knew that the Class Products are not "non-drowsy", which is how GSK markets the Class Products.

67.     GSK's advertisements and marketing of the Class Products as "non-drowsy" were consumer oriented.

68.     GSK's advertisements and marketing of the Class Products as "non-drowsy" were misleading in a material respect.

69.     By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce in New York, Plaintiff and the members of the Class have been substantially injured by overpaying for a product that has diminished value due to its risk of causing drowsiness and false claim of being "non-drowsy."

70.      GSK's conduct, as alleged herein, constitutes false advertising in violation of Section 350 of the New York General Business Law, and GSK is liable to Plaintiff and the members of the Class for the actual damages that they have suffered as a result of GSK's actions, the amount of such damages to be determined at trial, statutory damages, plus treble damages, and attorneys' fees and costs.

71.     GSK continues to violate Section 350 of the New York General Business Law and continues to aggrieve Plaintiff and the members of the Class.

72.     Plaintiff further demands injunctive relief enjoining GSK from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by Section 350 of the New York General Business Law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against GSK as follows:

A.     Certifying this action as a class action as soon as practicable, with the Class as defined above, designating Plaintiff as the named Class representative, and designating the undersigned as Class Counsel.

B.     On Plaintiff's Count I, awarding against GSK the damages that Plaintiff and the other members of the Class have suffered as a result of GSK's actions, the amount of such damages to be determined at trial, plus statutory damages and treble damages.

C.      On Plaintiff's Count II, awarding against GSK the damages that Plaintiff and the other members of the Class have suffered as a result of GSK's actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

D.      On Plaintiff's Count I and II, awarding Plaintiff and the Class interest, costs, and attorneys' fees.

E.      Enjoining GSK from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by Sections 349 and/or 350 of the New York General Business Law

F.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:      March 31, 2022
            White Plains, New York

**DENLEA & CARTON LLP**

By:      */s/ Jeffrey I. Carton*
         James R. Denlea
         Jeffrey I. Carton
         Steven R. Schoenfeld
         Robert J. Berg
         2 Westchester Park Drive, Suite 410
         White Plains, New York 10604
         Tel.: (914) 331-0100
         Fax: (914) 331-0105
         jdenlea@denleacarton.com
         jcarton@denleacarton.com

**KRAVIT SMITH LLP**

Philip M. Smith
75 South Broadway, Suite 400
White Plains, New York 10601
Tel.: (646) 493-8004
Fax: (917) 858-7101
psmith@kravitsmithllp.com

*Attorneys for Plaintiff*